United States District Court
For the Northern District of California

1
2
3
4
5                    UNITED STATES DISTRICT COURT
6                   NORTHERN DISTRICT OF CALIFORNIA
7
8    MARCUS MAY,                         No. C-11-02204 JCS
9            Plaintiff,                  **ORDER GRANTING PLAINTIFF'S**
                                         **MOTION FOR SUMMARY JUDGMENT,**
10       v.                              **DENYING DEFENDANT'S MOTION**
                                         **FOR SUMMARY JUDGMENT AND**
11   AT&T UMBRELLA BENEFIT PLAN NO. 1,   **REMANDING FOR AWARD OF**
                                         **BENEFITS [Docket Nos. 31, 36]**
12           Defendant.
     _____/
13

14   **I.    INTRODUCTION**

15          Plaintiff Marcus May brings this action for disability benefits under 29 U.S.C. §

16   1132(a)(1)(B), which provides for civil actions against employee benefit plans governed by the

17   Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*  Plaintiff

18   alleges that short-term disability benefits to which he was entitled under the terms of the employee

19   benefit plan offered by his employer, AT&T Umbrella Benefit Plan No. 1 ("the Plan"), were

20   wrongfully terminated.  The parties bring cross-motions for summary judgment, which are presently

21   before the Court. The Court finds that the motions are suitable for determination without oral

22   argument, pursuant to Civil Local Rule 7-1(b).  For the reasons stated below, Plaintiff's summary

23   judgment motion is GRANTED and Defendant's summary judgment motion is DENIED.[1]

24
25
26
27
28
     _____

          [1]The parties have consented to the jurisdiction of the undersigned United States magistrate judge
     pursuant to 28 U.S.C. 636(c).

United States District Court
For the Northern District of California

1    **II.    FACTUAL BACKGROUND**

2        **A.    The Disability Plan**

3        At all relevant times, Plaintiff has been covered by the AT&T Mobility Disability Benefits

4    Program ("the Disability Plan").  Declaration of John D. Adkins in Support of Defendant AT&T

5    Umbrella Benefit Plan No. 1's Motion for Summary Judgment ("Adkins Decl.") ¶ 3.  The Disability

6    Plan is a component of the larger AT&T Umbrella Benefit Plan No. 1 ("the Umbrella Plan").  Joint

7    Statement of Undisputed Material Facts ("UMF") No. 1.

8        Under the terms of the Disability Plan, AT&T Inc. is the Plan Administrator and, as such,

9    "has the sole and absolute discretion to interpret the provisions of the [Disability Plan], make

10   findings of fact, determine the rights and status of participants and others under the [Disability Plan]

11   and decide disputes under the [Disability Plan]."  Administrative Recod ("AR") 000264 (Summary

12   Plan Description at page 31); *see also* UMF No. 2.  The Disability Plan further provides that "[t]he

13   Plan Administrator may delegate any of its duties or powers [and that] [t]o the extent permitted by

14   law, such interpretations, findings, determinations and decisions shall be final and conclusive on all

15   persons for all purposes of the [Disability Plan]."  AR 000264.

16       Effective December 2008, AT&T Inc. contracted with a third party claims administrator,

17   Sedgewick Claims Management Services, Inc. ("Sedgewick"), to administer the Disability Plan and

18   "delegated fiduciary responsibilities, as defined by [ERISA]" to Sedgewick.  AR 000262; UMF

19   Nos. 4, 6, 7.  Thus, claims for Short-Term Disability ("STD") benefits under the Disability Plan

20   must be made to Sedgewick, and Sedgewick has discretion to determine eligibility for STD benefits

21   under the Disability Plan.  UMF Nos. 5, 8.  The team of Sedgewick employees assigned to decide

22   claims for disability benefits under the Disability Plan is referred to as the AT&T Integrated

23   Disability Service Center ("IDSC").  UMF No. 9.  Appeals and denials of benefit claims under the

24   Disability Plan are decided by Sedgewick's Quality Review Unit ("QRU").  UMF No. 10.

25       Under the terms of the Disability Plan, eligibility for STD benefits requires that a

26   participant's condition meet the following definition:

27       **Disability or Disabled.**
         For STD purposes, means that due to illness (including pregnancy) or injury, you are absent
28       from work and unable to perform the duties of your Customary Job, and you meet the other
         requirements contained in the Plan and this Program.

United States District Court

For the Northern District of California

AR 000262 (Summary Plan Description at page 29); *see also* UMF No. 11.  "Customary Job" is defined as "the work activity that you were hired to regularly perform for the Employer and that serves as your source of income from the Employer."  AR 000262 (Summary Plan Description at page 29).

To obtain STD benefits under the Disability Plan, the claimant must file a claim with the Claim Administrator, which "should contain all information requested on the forms and any additional information requested by the Claims Administrator."  AR 00255 (Summary Plan Description at page 22).  The Summary Plan Description further provides as follows:

> A claim will not be considered to be submitted to the Program until all required and requested information is provided.  All information should be provided as soon as practicable. . . .

> In order to establish your Disability you must present credible, objective medical evidence.  The Claims Administrator also may appoint an independent Physician to examine you in order to verify your Disability.

> While you are receiving STD, LTD or Supplemental LTD benefits under the Program, you are required periodically to provide the Claims Administrator with supplemental medical information from your Physician documenting your continued disability.  You may also be required to submit to an independent medical examination(s) or a functional capacity examination.

> It is your responsibility to provide the documentation supporting your claim on a timely basis.  If you fail to submit the documentation requested by the Claims Administrator, or if you refuse to be examined by a Physician appointed by the Claims Administrator in order to verify your Disability or continued Disability, your claim will be denied and your STD, LTD and Supplemental LTD benefits will stop.

*Id.* [2]

**B.      History of Plaintiff's Claim for Benefits**

Plaintiff Marcus May was hired on October 12, 2009 as a Retail Sales Consultant for AT&T Mobility.  UMF No. 14.  As a Retail Sales Consultant, Plaintiff was responsible for providing customer service, including answering questions for customers in the process of purchasing products and services.  AR 000133 (Job Description).  The physical requirements of the job are described as follows:

_____

[2]In the joint undisputed facts submitted by the parties, somewhat different language is quoted. *See* UMF, No. 13 ("The Disability Plan provides that '[i]t is your responsibility to provide credible, objective medical evidence to the Claims Administrator whenever requested.  If you fail to submit the documentation requested by the Claims Administrator . . . your claim will be denied . . . .'").  This language is purportedly found at AR 000262.  However, the Court finds no such language on that page.

☐ Ability to lift up to 25 pounds.  ☐ Must be able to stand for long periods of time while servicing customers.

AR 000133.[3]

On August 26, 2010, Plaintiff went on leave due to severe knee pain.  UMF No. 17; AR 000067.  On August 30, 2010, Plaintiff called his internist, Dr. Beth Schweitzer, at Fairmont Hospital/Winton Wellness Center, part of Highland Hospital (hereinafter "Fairmount"), complaining of "increasing pain in his" left knee.  AR 00067.   Plaintiff was advised to "rest and elevate [his] leg."  AR 000067.   An appointment was made for the following day.  *Id.*   The notes from that visit state, in part, as follows:

Subjective:

Pt. is here on a drop in basis with c/o of left knee pain which is worse over past week.  Felt that knee 'buckled' about a week ago, says he can't bend the knee or straighten it out... walks with difficulty.  Pt has hx of gout, previously took colchicine but says he has not taken colchicine for a very long time (approx. 6 mo.)  Taking ibuprofin 800 mg [ ] for pain ... Says pain is better today.  Works part time for AT&T, works as a salesman and is on his feet all day at work . . .

Objective:

GEN: obese m., ambulates with difficulty

. . .

BJE: left knee with markedly decreased rom, mild swelling, no pinpoint tenderness to touch, no warmth, no redness

. . .

Assessment:

Left Knee Pain, severe
Hx gout
HTN, fair control

Plan:

Tylanol [sic] with Codeine . . .
X-ray, two views, left knee

---

[3]This information is contained in a single-page document found in the Administrative Record carrying the heading "Job Title: Retail Sales Consultant" and including a variety of information about that position.  Presumably, the document (or at least, the information in it) was provided by AT&T Mobility and is an official document that accurately describes the nature of Plaintiff's position and its physical requirements.  The Court notes that the parties cite this document as evidence that supports UMF Nos. 15-16.

MRI referral for left knee.

Nutritionist Referral
Wt los discussed, encouraged, at length
Return to work slip, pt should not work for approx 2 weeks.

AR 00068.

On September 10, 2010, Plaintiff returned to Fairmount for a follow-up appointment.   AR

00069.  The report of that visit states, in part:

Subjective:
Pt is still having knee pain.  He started taking motrin because other pain medication did not help. He can walk a littler better but does not feel he is ready to work.

*Id.*  The report notes that x-rays showed "tricompartmental arthritis left knee." *Id.*  Plaintiff was

referred to an orthopedist and instructed to schedule an MRI.  *Id.*

On September 10, 2010, Dr. Schweitzer completed a Claim for Disability Insurance Benefits

– Doctor's Certificate ("Doctor's Certificate") in support of Plaintiff's disability claim.  AR 000011,

AR 000070.[4]  The Doctor's Certificate is a form issued by the Employment Development

Department ("EDD") of the State of California and was submitted to EDD.  UMF 26.  The form

describes Plaintiff's diagnosis as "acute knee pain and arthritis."  AR 00070.  The form also includes

a single line in which to state "Findings," in which Dr. Schweitzer wrote: "Pt has pain and swelling

and decreased ROM." *Id.*  The return-to-work date indicated on the form was October 3, 2010.  *Id.*

On September 13, 2010, IDSC sent Plaintiff a letter informing him that it had submitted a

claim for STD benefits on his behalf.  UMF No. 18.  Attached to the letter was a form to be

completed by Plaintiff's physician, entitled "Initial Physician's Statement," as well as other forms,

which he was instructed must be submitted by September 21, 2010.  AR 00053; UMF 21.  The letter

cautioned that "[i]t is critical that your physician demonstrates by his/her observations and clinical

findings that you are unable to perform your work with or without accommodations." *Id.*

On the same date, IDSC also issued a "Reported Disability Claim Notice" directed to the

attention of Plaintiff's supervisor, Daniel S. Milanese.  AR 51-52.

---

[4]The Doctor's Certificate that Dr. Schweitzer completed on September 10 is similar – but not identical – to the Initial Physician's Statement sent to Plaintiff on September 13.  Compare AR 00070 (Claim for Disability Insurance Benefits – Doctor's Certificate) with AR 00064 (Initial Physician Statement).  The former is a form issued by the Employment Development Department ("EDD") of the State of California and was submitted to EDD.  UMF 26.

On September 14, 2010, IDSC Disability Specialist Dwight Dixon sent a request to Dr. Schweitzer's office for medical information, including "[c]opies of office/chart notes from 8/26/10," "[c]opies of all operative reports, hospital summaries, and discharge notes," "[c]opies of all medical data (i.e. x-ray/MRI reports, lab results, etc.)." AR 46-47.  On the same day,  Mr. Dixon spoke to Plaintiff about his claim.  AR 0006.  The following is an excerpt of Mr. Dixon's notes of that conversation:

> introduce cm. . .
>
> Dx, symptoms and/or complaints: severe arthritis in his knee and can't bend or extend her [sic] knee
> job duties: stand 8-9 hours a day
> fda: 8/26/10
> Other Condition: hypertension controlled with medication
> Procedure: x-ray has been done.  MRI to be scheduled
> Admission date: n/a
> Discharge date: n/a
> Surgery date: n/a
> Medications: pain medication - Tylenol 3 with codine [sic] and ibuprofen
> Hospital information: n/a
> FOV: 8/30/10
> NOV: waiting for MRI appnt to be set up
> R/l's: has been using crutches, but is not using them currently
> ERTW: 10/3/10
> Release of Information signed: yes
> State Disability filed?  he has the form and is in the process of getting it completed.
>
> . . .
>
> TWP: informed ee that at some point within the time period off of work, cm will attempt to return ee back to work under modified duties.  By requesting ee's functional limitations from their [sic] provider and offering any restrictions/ limitations to the department for accommodations.

*Id.*

On September 14, 2010, Mr. Dixon also sent an email to Plaintiff's manager, Daniel Milanese requesting information about Plaintiff's STD claim, including a "detailed description" of Plaintiff's job duties and the exertion level of Plaintiff's position (ie., sedentary, light, medium or heavy). AR 0007.  Mr. Dixon asked if Plaintiff's department had "any accommodation for restrictions the employee may return to work with." AR 0008.

United States District Court

For the Northern District of California

Records of the August 30, 2010 telephone call and the August 31, 2010 and September 10, 2010 visits to Dr. Schweitzer, as well as the Doctor's Certificate (discussed above) were faxed to IDSC on September 20, 2010.  UMF Nos. 24-25.   The Initial Physician's Statement form does not appear to have been submitted to IDSC.[5]

On September 20, 2010, Mr. Dixon also received an email response from Plaintiff's manager, Daniel Milanese.  AR 0008-0009.  Mr. Milanese described Plaintiff's job duties as follows: "Assisting customers on the sales floor for the duration of his scheduled shift.  Requires that he is on his feet during this time, moving around the store."  AR 0009.  In response to Mr. Dixon's question regarding possible accommodations, Mr. Milanese responded: "Chairs are not allowed on the sales floor. . . .Employee must be able to walk around and stand on his feet during his shift."  *Id.*

On September 21, 2010, IDSC sent Plaintiff's manager an email informing him that Plaintiff's STD claim had been approved through October 3, 2010.  AR 00071-00073.  IDSC also sent Plaintiff a letter informing him that his claim had been approved.  AR 00074.  The letter further informed Plaintiff as follows:

> In the event that you will not recover sufficiently to resume your job duties, with or without reasonable accommodations, at the end of the approval period, updated medical documentation including chart notes, diagnostic test results, hospital discharge summaries, etc. will need to be provided to AT&T Integrated Disability Services Center by 10/03/2010.

AR 00074.

On September 28, 2010, Mr. Dixon called Plaintiff and Dr. Schweitzer's office to remind them that updated medical information would be required if Plaintiff sought to extend his STD benefits beyond October 3, 2010.  AR 00012.  Mr. Dixon called Plaintiff and Dr. Schweitzer again on Friday, October 1, 2010, to remind them that Plaintiff's STD benefits would expire soon if IDSC did not receive updated medical information in support of Plaintiff's claim.  AR 00013.  Both Plaintiff and Dr. Schweitzer informed Mr. Dixon that Plaintiff had an appointment to see Dr. Schweitzer at 2 p.m. that afternoon.  *Id.*

On Monday, October 4, 2010, Plaintiff did not return to work and IDSC did not receive any further documentation, either from Dr. Schweitzer's office or from Plaintiff.  AR 00015.  At the end

---

[5]Defendant does not assert, however, that Plaintiff's claim was denied because his doctor failed to submit the proper form.

United States District Court

For the Northern District of California

of the day, Mr. Dixon called Plaintiff to inquire whether he would be submitting updated medical records. *Id.* Plaintiff told Mr. Dixon that he had been having a bad day and hadn't been able to bend his knee at all and so had been unable to leave the house but that he had a form from his doctor that he would fax to IDSC the next day, with a return to work date of October 10, 2010. *Id.*

The next day, Plaintiff faxed to IDSC a form entitled Certification of Treatment/Return to Work, completed by Leslie Reynolds, PA. AR 00079.[6]  The form indicated that Plaintiff had received treatment on October 1, 2010 and stated that Plaintiff could return to work on October 10, 2010 with the following restrictions: "working 4 hrs a day . . .may need chair to sit." *Id.*  Although the Certification of Treatment form did not specify the treatment sought on October 1, 2010, Mr. Dixon understood that this notation referred to the visit to Dr. Schweitzer's office the previous Friday. AR 00017.  Accordingly, Mr. Dixon contacted Dr. Schweitzer's office on October 14, 2010 to request the records from that visit. *Id.*

On October 14, 2010, Plaintiff faxed to IDSC a form completed by Dr. Schweitzer on October 8, 2010 entitled "Physician's Supplementary Certificate." AR 00085.  The form stated that Plaintiff was last seen on October 8, 2010 and listed his diagnosis as "Gout/knee pain." *Id.*  In response to the request that the doctor "[d]escribe how the patient's present condition or impairment prevents him or her from returning to regular and customary work," Dr. Schweitzer wrote" "still having pain in [left] knee – referred to orthopedic." *Id.*  Dr. Schweitzer further stated that the factor "disabling the patient longer than previously estimated" was that "pt. has not completely resolved knee pain." *Id.*  Dr. Schweitzer estimated Plaintiff could return to work on November 1, 2010. *Id.*

On October 19, 2010, at 6:40 pm, Mr. Dixon contacted Dr. Schweitzer's office to set up a "PA review on 10/21/10 or 10/22/10." AR 00019.  The assistant who took the call, Catalina, told Mr. Dixon that she didn't have Plaintiff's chart available and was just leaving the office so she would have to call back the next day. *Id.*   Mr. Dixon called back the next day and spoke to Catalina again. AR 00020.  Catalina informed Mr. Dixon that Dr. Schweitzer would have to call him back to set up PA review appointment. *Id.*   Dr. Schweitzer did not return Mr. Dixon's call.

---

[6]Mr. Dixon incorrectly referred to the provider as "Leslie English" in his notes, apparently confusing the notation on the form referring to the patient's primary language with the provider's name. AR 00079.

United States District Court

For the Northern District of California

1        On October 20, 2010, IDSDC referred Plaintiff's claim to IPA Dr. David L. Hinkamp, Board

2   Certified Occupation/Environmental Medicine, for further review of Plaintiff's functional abilities.

3   UMF No. 43.  Dr. Hinkamp was asked whether there were any objective findings that prevented

4   Plaintiff from performing his job duties of talking, typing, standing, walking and lifting up to 25

5   pounds.  AR 00020.  He was also asked whether Plaintiff could return to work with modifications

6   and if so, what restrictions and limitations would be required.  *Id.*

7        On October 22, 2010, Dr. Hinkamp called Dr. Schweitzer's office and left a recorded

8   message.   AR 00021.[7]

9        On October 25, 2010, Dr. Hinkamp reviewed the records from Dr. Schweitzer's office and

10   the x-ray results.[8]  He then offered the following "rationale":

11      The medical notes document that the EE had gout, and knee pain.  On 9/10/10, the x-ray
        showed tricompartmental arthritis of the left knee.  The EE was treated for gout.  On
12      10/08/10, the say [sic] that the EE may RTW on 10/10/10 – working 4 hrs a day with may
        need chair to sit until his next appointment, on 10/25/10.  There is a note that the EE is being
13      referred to orthopedics.

14      There are no objective findings or limitations of activities outside of work noted.  There are
        no orders for bedrest.  I was unable to speak with Dr. Schweitzer to obtain further
15      information.

16      Answer to CM questions:

17      1.      Are there any objective findings that prevent the EE from performing their [sic] job
        duties of talking, typing, standing, walking, and lifting up to 25 pounds?
18
        Currently, there are insufficient objective findings to prevent the EE from performing their
19      job duties of talking, typing, standing, walking, and lifting up to 25 pounds.

20      2.      If so, can they RTW under modifications?

21      No modifications are supported by the currently available objective medical fidnings.

22      3.      What are the restrictions and durations?

23      N/A

24      4.      Does the treatment provider agree with the restrictions?

25      Unknown.

26      ───────────────────

27          [7]The contents of Dr. Hinkamp's recorded message is not provided in his report.

28          [8]It is unclear whether Dr. Hinkamp reviewed the underlying medical records or rather, merely
    reviewed the JURIS notes maintained by IDSC in connection with Plaintiff's claim.  The Court notes
    that Dr. Hinkamp, like Mr. Dixon, referred to treatment on October 1, 2010 by Leslie "English" rather
    than Leslie Reynolds.  AR 00022.

AR 00023-00024.

In the meantime, on October 22, 2010, Leslie Reynolds, of Dr. Schweitzer's office, had returned Dr. Kinkamp's call (of the same day) and spoken to a different doctor, Dr. Inns.[9]  AR 00025.  The notation from that telephone call, which was entered into the JURIS notes maintained by IDSC on October 26, 2010, states, in part, as follows:

> Ms. Reynolds stated that the patient is off work and was last seen on 10/8/10 with symptoms/findings including knee pain.  They are still working up the knee pain as they are awaiting an MRI to give additional diagnostic information.  As such, the expected return to work date is currently unknown.  She also notes that they have cleared the patient for modified duty, but apparently, the employer was unable to accommodate that.

*Id.*  Apparently, Dr. HinKamp was unaware of this conversation when he concluded on October 25, 2010 that Plaintiff did not qualify for STD benefits.  However, on October 26, 2010, Dr. Hinkamp wrote that "[t]his additional information does not provide additional objective medical findings that would support changes to the opinions expressed in the Physician's Advisor Review of 10/22/10."  *Id.*

On November 2, 2010, Mr. Dixon, on behalf of the Disability Plan, sent Plaintiff a letter informing him that his claim for continued STD benefits had been denied effective October 4, 2010.  AR 00087-00088.  The letter stated the following reasons for the denial:

> Our determination to deny benefits is based on a review of the medical documentation provided by Dr. Schweitzer on 10/05/2010[10] and 10/14/2010[11] consisting of a Physician's statement and work note.  According to the medical information, you were being treated for left knee pain and recommended to return to work with restrictions of working 4 hours per day and the availability of a chair as needed to sit down.  Unfortunately, there were no observable medical findings provided to support your disability or the need for restricted or light duty.
>
> In order to help the AT&T Integrated Disability Service Center understand how your condition may have caused an inability to function in your occupation the AT&T Integrated Disability Service Center sent your file to a Physician Advisor for review on 10/20/2010.  The Physician Advisor called Dr. Schweitzer on 10/22/2010 to discuss the medical

---

[9]Although it is unclear why the call was taken by a different doctor, Defendant does not dispute that the call from Ms. Reynolds was in response to Dr. Hinkamp's telephone message.  *See* Motion at 9 ("Although Dr. Schweitzer never returned Dr. Hinkamp's telephone call, Ms. Reynolds from Dr. Schweitzer's office called him.")

[10]The only medical documentation reflected in the JURIS notes that was received on 10/05/10 is the Certification of Treatment/Return to Work form completed by Leslie Reynolds on October 1, 2010.  *See* AR 00016, 00078-00079.

[11]Based on the JURIS notes, this appears to be a reference to the "Physician's Supplemental Certificate" completed by Dr. Schweitzer on October 8, 2010.  *See* AR 000018, 00084-00085.

United States District Court
For the Northern District of California

information submitted, but Dr. Schweitzer was not available at the time. The Physician Advisor left a message for a return call, which was returned by Leslie Reynolds, PA on 10/22/2010. Leslie advised that you were last seen on 10/08/2010 and they were still working up your knee pain. Additionally, they were awaiting an MRI to give additional diagnostic information. As such, your expected return to work date was unknown. The Physician Advisor reviewed the available medical information and agreed that the clinical information lacked clear findings that prevented you from performing the essential functions of your occupation.

AR 00087- 00088. The letter also advised Plaintiff that he had the right to appeal the decision and included an appeal form and instructions for filing an appeal. AR 00088-00094. The appeal form instructed that any new medical information should be submitted "as soon as reasonably possible." AR 00090.

On November 5, 2010, Plaintiff called IDSC to advise that he had additional medical documentation that he planned to submit. UMF No. 48. On November 8, 202, Plaintiff faxed to IDSC the following documents: 1) a letter from Plaintiff to IDSC asking it to correct an error regarding the amount of Plaintiff's state disability payments; 2) proof of state disability income earnings; 3) a second letter from Plaintiff explaining that an MRI had recently been performed and showed that he had a "valid disability" and was "unable to stand the eight hour shifts" that were required for his position; 4) an MRI report dated November 3, 2010; and 5) a Certificate of Treatment/Return to Work form dated November 5, 2010, completed by Leslie Reynolds, PA, stating that Plaintiff's return to work date was February 1, 2011 ("the November 5 Return-to-Work Form"). UMF No. 48, AR 00103 -00109.

The November 3, 2010 MRI report stated, in part, as follows:

FINDINGS

There is intrasubstance signal abnormality in the posterior horn and body of the medial meniscus, without evidence of a discrete tear. The medial collateral ligament is intact. There is mild medial compartment arthrosis with subchondral edema in the anterior medial tibial plateau. The body of the medial meniscus is mildly extruded.

The anterior cruciate ligament is increased in signal with some enlargement near the femoral attachment, compatible with mucinous degeneration. Anterior cruciate ligament sprain or partial disruption cannot entirely be excluded. There is evidence of some contiguity of fibers. Complete anterior cruciate ligament disruption is not demonstrated. The posterior cruciate ligament is slightly heterogeneous in signal and mildly thickened but intact.

The lateral meniscus is intact. There is some enlargement and increased signal in the posterior horn lateral meniscal roor, compatible with intrameniscal degeneration and early cyst formation. The lateral collateral ligament and popliteus tendon appear normal. The iliotibial band is unremarkable.

11

There is moderate to severe femeropatellar arthrosis with full thickness chondral loss in the lateral patellar facet and patellar apex. Mild subcortical edema is present in the lateral facet. Mild generalized chondral thinning and irregularity is present in the trochlear groove. The extensor mechanism is intact. A small to moderate joint effusion is present with evidence of mild synovitis.

IMPRESSION

1.  Increased signal and thickening of the anterior cruciate ligament, compatible with mucinous degeneration or partial anterior cruciate ligament disruption. No evidence of complete anterior cruciate ligament disruption. Correlate with clinical findings.
2.  Mild thickening and increased signal in the posterior cruciate ligament, consistent with low-grade partial disruption.
3.  Femeropatellar arthrosis with grade IV chondrosis of the lateral patellar facet and patellar apex and grade II chondrosis of the trochlear groove.
4.  Joint effusion with evidence of synovitis.

AR 000107-000108. The report was signed by Doctor Ravi Alagappan. AR 000108.

On November 10, 2010, Plaintiff faxed an appeal form to IDSC's Quality Review Unit ("QRU"). UMF No. 50. On the form, Plaintiff stated that the reason for his appeal was that he was "unable to stand for 8 hours a day which my current position requires." AR 000110.

On November 11, 2011, Mr. Dixon sent Plaintiff an "update," informing Plaintiff that IDSC had received the November 5 Return to Work Form completed by Leslie Reynolds on November 7, after it had denied Plaintiff's continued STD benefits claim. AR 00016. The letter stated that IDSC had reviewed this addition form "as a courtesy" but that it did "provide clinical evidence to support disability" from 10/04/2010 through Plaintiff's return-to-work date and did "not alter" IDSC's previous denial. *Id*. The letter made no mention of the MRI results. Included with the November 11, 2010 denial letter was another copy of the QRU appeal form. UMF No. 53.

On November 16, 2010, IDSC sent Plaintiff a letter acknowledging his appeal. AR 000125. The letter quoted the definition of "total disability" for STD benefits (quoted above) and stated that "[m]edical records including chart notes, diagnostic tests, and hospital summaries, relevant to this absence should be submitted regardless of the length of the disability." *Id*. On the same date, Appeals Specialist Deborah Patterson called Plaintiff to discuss the appeal process. UMF No. 56; AR 00032.

On November 29, 2010, Plaintiff provided IDSC with  additional medical records. UMF No. 60; AR 00127-00130. First, Plaintiff provided a "Referral Form for Outside Medical Services" from Alameda County Medical Center dated November 23, 2010, requesting a hinged knee brace to treat

United States District Court

For the Northern District of California

1   Plaintiff's "ligamentous injury."  AR 000128.  Second, Plaintiff provided a "Treatment

2   Authorization Form" for the hinged knee brace, signed by Dr. Solares. AR 000129.  Third, Plaintiff

3   provided a Certification of Treatment/Return to Work form dated 11/23/2010 ("the November 23,

4   2010 Return-to-Work Form").  AR 000130.  This form stated that Plaintiff had been diagnosed with

5   "ligamentous injury" and that he was expected to be able to return to work in March 2011 with the

6   following limitations: "may not stand  > 1 hr without break, if prolonged standing required, needs

7   seated assistance."  *Id*.  Finally, Plaintiff provided a note from Dr. Shah, of Laurence Orthopedics,

8   indicating that Plaintiff was seen on November 23, 2011 for a hinged knee brace.   AR 000126.

9       On December 7, 2010, the QRU referred Plaintiff's claim to Dr. William C. Andrews Jr.,

10  Board Certified in Orthopedic surgery, for an independent review.  UMF No. 62.  Dr. Andrews

11  reviewed the IDSC case notes, Plaintiff's job description, and records (including the MRI findings)

12  from AIC Fairmount/Winton, Alameda County Medical Center, Dr. Schweitzer, Leslie Reynolds,

13  Laurence Orthopedic and Dr. Alagappan.  AR 00137.  Dr. Andrews left voicemail messages with the

14  office of Dr. Schweitzer and Leslie Reynolds and Drs. Solares and Shah.  *Id*.  In both, he stated that

15  if the calls were not returned within 24 hours, the doctors' input would not be considered in Dr.

16  Andrews' report.  *Id*.  As to all of the providers, Dr. Andrews' report states that "a call back was not

17  received within 24 hours."  *Id*.

18      Dr. Andrews concluded that Plaintiff was not disabled from his regular job as of October 4,

19  2010 and offered the following "rationale" in support of his conclusion:

20          Mr. May has a stretch-type injury to his ACL and the ACL by MRI is intact.  He also has
            some patellofemoral arthrosis.  Patient has subjective complaints of left knee pain.  MRI does

21          not demonstrate instability and no significant damage in his knee other than chronic arthritis
            It should be noted there are no office notes or comprehensive exams with clinical findings

22          available for the period of disability being reviewed.  Based on the documentation, it would
            certainly be reasonable for him to work in his regular unrestricted  job, which indicates he

23          has a 25-pound lifting capacity and standing for long periods of time.  There is nothing about
            the MRI findings that would preclude that.  Therefore, from an orthopedic perspective

24          documentation does not support the employee to be disabled from his regular job as of
            10/04/10 through present.

25

26  AR 000139.

27      On December 10, 2010, Deborah Patterson, on behalf of the Disability Plan, sent Plaintiff a

28  letter informing him that his appeal had been denied.  AR 000146-000147.  The letter cited the

United States District Court

For the Northern District of California

1  conclusions of Dr. Andrews that the "medical information did not support that [Plaintiff was]

2  disabled from [his] regular job from October 4, 2010 through present."  AR 000147.

3  **III.     THE MOTIONS**

4      **A.     Defendant's Summary Judgment Motion**

5         Defendant asserts that it is entitled to summary judgment because the applicable standard of

6  review is abuse of discretion and here there has been no abuse of discretion.  Defendant AT&T

7  Umbrella Benefit Plan No. 1's Motion for Summary Judgment ("Defendant's Motion") at 14.  First,

8  Defendant contends that it is Plaintiff's burden to prove his entitlement to continued Plan benefits;

9  this burden does not shift simply because the Plan initially granted benefits.  *Id.* at 15.  According to

10  Defendant, Plaintiff failed to meet this burden because, although there was evidence that Plaintiff

11  needed a knee brace and physical therapy and the MRI showed some thickening of the ACL, "there

12  was no tear."  *Id.* at 16.  Further, Defendant contends, "no examination or test results were provided

13  to support the severity of [Plaintiff's] condition."  *Id.*  Therefore, Defendant argues, Sedgewick

14  reasonably concluded that "Plaintiff's knee pain and stretch-type injury to his ACL did not rise to

15  the level of rendering him unable to work as a Retail Sales Consultant."  *Id.*

16         Second, Defendant contends that under the abuse of discretion standard, the claim

17  administrator's findings must be upheld unless they are clearly erroneous.  *Id.*  Thus, a court may

18  overturn the administrator's decision only where it has a "definite and firm conviction that a mistake

19  has been committed."  *Id.* (*quoting Concrete Pipe & Products of Cal. In. v. Construction Laborers*

20  *Pension Trust for Southern Cal.*, 508 U.S. 602, 623 (1993)).  Here, Defendant asserts, that standard

21  is not met because its decision was supported by substantial evidence in the administrative record,

22  the decision does not conflict with the plain language of the disability plan and Sedgewick provided

23  a detailed explanation of its decision.  *Id.* at 17.  Defendant points to Dr. Andrews' conclusion "that

24  the MRI findings established that there was no tear to Plaintiff's knee, and that he did not require

25  surgery, but instead only needed a knee brace."  *Id.*  Defendant further cited Dr. Andrews' opinion

26  that "there was no significant damage to Plaintiff's knee, other than arthritis, and that Plaintiff's

27  inability to work was based solely on his subjective pain."  *Id.* at 17.  In addition, Defendant notes

28  that Dr. Solares and Ms. Reynolds "both agreed that Plaintiff could return to his regular job with

United States District Court

For the Northern District of California

1   restrictions that Plaintiff could work no more than 4 hours a day, and/or that he may need a chair to

2   sit, and/or that he could not stand more than 1 hour at a time without a break." *Id*.

3       Finally, Defendant contends that "[e]ven if, *arguendo*, Plaintiff's treating physicians had a

4   contrary view to the QRU and/or Dr. Andrews of Plaintiff's condition, Sedgewick's decision to

5   uphold the denial of further STD benefits was not arbitrary and capricious because the plan

6   administrator is not required to give special deference to a participant's doctor's opinions." *Id*. at

7   19.  Because Dr. Schweitzer's opinion was conclusory and was based on Plaintiff's subjective

8   complaints of pain rather than examinations or clinical findings, Defendant asserts, the administrator

9   was not required to adopt Dr. Schweitzer's opinion.  In contrast, Defendant contends, the opinion of

10   Dr. Andrews was supported by the medical documents because "Plaintiff's MRI report showed no

11   ligament tears or substantial damage to his knee, and not one of his doctors recommended surgery."

12   *Id*.

13       In support of Defendant's Motion, Defendant filed two declarations: 1) Declaration of Susan

14   Hagestad in Support of Defendant AT&T Umbrella Benefit Plan No. 1's Motion for Summary

15   Judgment ("Hagestad Decl."); and 2) Declaration of John D. Adkins in Support of Defendant AT&T

16   Umbrella Benefit Plan No. 1's Motion for Summary Judgment ("Adkins Decl.").  In addition, in

17   support of its Reply, Defendant filed the Supplemental Declaration of Susan Hagestad in Support of

18   Defendant AT&T Umbrella Benefit Plan No. 1's Motion for Summary Judgment ("Supp. Hagestad

19   Decl.").

20       In her opening declaration, Ms. Hagestad states that she is an employee of Sedgwick and

21   holds the position of Manager of Total Performance.  Hagestad Decl., ¶ 1.  She goes on to

22   address the relationship between Sedgwick and the Disability Plan and describe the claims process

23   administered under the Disability Plan.  *Id*., ¶¶ 3-11, 13-14.  The remainder of the declaration

24   summarizes the administrative record in this case.   In her supplemental declaration, Ms. Hagestad

25   addresses the process by which Independent Physician Advisors ("IPAs") are retained by Sedgwick.

26   According to Ms. Hagestad, the IPAs are employed by third party vendors, and Sedgwick does not

27   have any role in selecting the individual medical IPA who reviews a particular disability case.  Supp.

28   Segwick Decl., ¶ 2.  Ms. Hagerstad further states that "[n]o Sedgwick employee receives monetary,

or any other type of, incentive from AT&T Inc., nor does Segwick have any type of target or goal

**United States District Court**
For the Northern District of California

1  for the number of disability claims to approve and/or deny." *Id.*, ¶ 3.  The third declaration, by

2  AT&T Services, Inc. Senior Benefits Analyst John Adkins, provides an overview of the Disability

3  Plan and the Umbrella Plan, as well as Segwick's role in the administration of the Disability Plan.

4  **B.      Plaintiff's Summary Judgment Motion**

5         Plaintiff seeks summary judgment reversing the denial of benefits on the grounds that he

6  could not stand for eight hours, which was a required duty, and he had submitted his treating

7  physician's reports verifying his knee injury, disease and physical limitations.  Plaintiff's Motion for

8  Judgment on the Administrative Record; FRCP Rule 65 ("Plaintiff's Motion") at 4.  According to

9  Plaintiff, "[h]aving never examined Mr. May (although the policy allowed for exams), defendant

10 simply disagreed with the treating physicians, and arbitrarily substituted their own consultants'

11 subjective determination of the degree of plaintiff's knee injury and pain instead of the findings and

12 conclusions of plaintiff's treating physicians. *Id.*

13        As a preliminary matter, Plaintiff contends that the abuse of discretion standard should be

14 applied with heightened scrutiny because Sedgwick, although a third party administrator, has a

15 financial conflict of interest in light of "the strict performance standards imposed by the Plan

16 severely limiting denials to be reversed on appeal." *Id.* at 5.  Plaintiff has not offered any evidence

17 in support of this contention, instead stating that "discovery responses marked 'Confidential' will be

18 available to the Court at argument." *Id.*  Plaintiff also asserts that the value of the financial

19 arrangement between the medical group consultants and Sedgwick creates a "financial incentive for

20 the medical consulting group to deliver medical opinions in line with a pre-determined denial of

21 benefits." *Id.*  Plaintiff promises to offer at the hearing discovery marked "For Attorneys Eyes

22 Only" in support of this position.  *Id.*

23        Plaintiff further contends that the denial of benefits was an abuse of discretion because it was

24 based on a conclusory determination of lack of objective medical evidence, with no analysis of the

25 MRI results showing knee injury and disease and no explanation of how the treating physicians

26 reached erroneous conclusions about Plaintiff's disability. *Id.* at 8-9.  "A detailed analysis of the

27 medical records combined with an in office examination is what should have been the basis for a

28 disability decision, not one remote medical records review by a medical group deriving a large

income from services to Sedgwick." *Id.* at 9.  Plaintiff further notes that "Mr. May, uninsured, had

16

1    all medical treatment through Alameda County Medical Services with no financial incentive

2    whatsoever to appease Mr. May, and given a crushing work load, certainly no time to respond to

3    frequent requests of the defendant for immediate explanations and justifications." *Id*.

4        Plaintiff requests an award of STD benefits from the date of denial for the full 22-week

5    period for which short term disability benefits are available under the Disability Plan. *Id*. at 18.

6    Should the Court enter judgment in his favor and award continued STD benefits, Plaintiff will then

7    file an application for long term disability benefits in accordance with the Disability Plan

8    requirements. *Id*. Plaintiff also requests an award of fees and costs under 29 U.S.C. § 1132(g),

9    arguing that the Court should exercise its discretion to award fees under this section because

10   Defendant acted arbitrarily in denying Plaintiff's request for continued STD benefits. *Id*. at 19.

11       In support of his motion, Plaintiff filed his own declaration. Declaration of Marcus May in

12   Support of Plaintiff's Motion for Summary Judgment; FRCP 56 ("May Decl."). In his declaration,

13   Plaintiff summarizes the history of his medical condition and of his claim for disability benefits. He

14   states, *inter alia*, that when he attempted to return to work after his doctor told him he could try to

15   return to work with some restrictions, he was told by AT&T that it would not allow him to return to

16   work with restrictions and would not allow him to sit in a chair while working. May Decl., ¶ 6. He

17   also states that he was terminated from his position when he failed to return to work after Sedgewick

18   determined that Plaintiff could stand for his entire eight-hour shift. *Id*., ¶¶ 6-7. Finally, Plaintiff

19   states that he suffered a stroke in November 2011 and has been unable to rehabilitate his knee as a

20   result. *Id*., ¶ 9.

21       **C.    Defendant's Motion to Strike**

22       Defendant brings a motion to strike the May Declaration, asserting that the declaration

23   should be stricken because it is not part of the administrative record. Docket No. 42 at 3. Defendant

24   further contends that to the extent that the May Declaration states that Plaintiff suffered a stroke in

25   November 2011, is irrelevant and also more prejudicial than probative. *Id*. at 3-4.

26       **D.    Plaintiff's Opposition to Defendant's Summary Judgment Motion**

27       In his response to Defendant's Summary Judgment Motion, Plaintiff reiterates his position

28   that a heightened scrutiny application of the abuse of discretion standard should be applied.

**United States District Court**
For the Northern District of California

1  Plaintiff's Opposition at 1.  Even if no heightened scrutiny is applied, however, Defendant's denial

2  should be reversed because it was arbitrary and unreasonable, Plaintiff contends.  *Id.*

3    In response to Defendant's motion to strike the May Declaration, Plaintiff points to the

4  Hagestad and Adkins declarations filed by Defendant, arguing that if his declaration is stricken, so

5  too should Defendant's declarations, which are also outside of the administrative record.  Plaintiff's

6  Opposition at 10.

7    **E.**  **Defendant's Opposition to Plaintiff's Summary Judgment Motion**

8    In its Opposition to Plaintiff's motion, Defendant rejects Plaintiff's contention that the denial

9  of STD benefits should be reviewed with heightened scrutiny, pointing out that Plaintiff has offered

10  no admissible evidence that establishes a conflict of interest.  Defendant's Opposition at 14.

11  Defendant also cites decisions in this district in which courts have rejected the same argument. *Id.* at

12  15 (citing *Burrows v. AT&T Umbrella Benefit Plan No. 1*, 2011 WL 996748, at *2-3 (N.D. Cal. Mar.

13  21, 2011); *Edwards v. AT&T Disability Income Plan*, 2009 WL 650255, at *11 (N.D. Cal. Mar. 11,

14  2009)).  Finally, Defendant reiterates the arguments its motion, namely, that the administrator did

15  not abuse its discretion in denying continued STD benefits.

16  **IV.**  **ANALYSIS**

17    **A.**  **Applicable Standard of Review**

18    "A denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a

19  *de novo* standard unless the benefit Plan gives the administrator or fiduciary discretionary authority

20  to determine eligibility for benefits or to construe the terms of the Plan."  *Firestone Tire and Rubber*

21  *Company v. Bruch*, 489 US 101, 115 (1989).  Where the administrator has been granted

22  discretionary authority, a denial of benefits is reviewed for an abuse of discretion.  *Id.*  In applying

23  the abuse of discretion standard, courts should take into account any conflict interest on the part of

24  the plan administrator.  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006).

25  "[A]n insurer that acts as both the plan administrator and the funding source for benefits operates

26  under what may be termed a structural conflict of interest." *Id* (citing *Tremain v. Bell Indus., Inc.*,

27  196 F.3d 970, 976 (9th Cir.1999)).  Because a structural conflict gives the plan administrator an

28  incentive to pay as little as possible in benefits, the Ninth Circuit has held that the court should apply

United States District Court

For the Northern District of California

1  the abuse of discretion standard in a manner that is "informed by the nature, extent, and effect on the

2  decision-making process of any conflict of interest that may appear in the record." *Id*. at 967.

3        As stated above, under the Disability Plan, AT&T Inc. is the Plan Administrator and has

4  "sole and absolute discretion to interpret the provisions of the [Disability Plan], make findings of

5  fact, determine the rights and status of participants and others under the [Disability Plan], and decide

6  disputes under the [Disability Plan]. Further, the "Plan Administrator may delegate any of its duties

7  or powers." As it is undisputed that AT&T Inc. has delegated its authority to make benefits

8  determinations under the Disability Plan to Sedgewick, the Court reviews the denial of Plaintiff's

9  benefits for an abuse of discretion.

10       The Court further finds no conflict of interest has been established that affects its application

11  of the abuse of discretion standard under *Abatie*.

12       **B.      Abuse of Discretion Standard**

13       When reviewing for abuse of discretion, the Court "cannot substitute [its] judgment for the

14  administrator's ... [and] can set aside the administrator's discretionary determination only when it is

15  arbitrary and capricious." *Jordan v. Northrop Grumman Welfare Benefit Plan*, 370 F.3d 869, 875

16  (9th Cir.2004), overruled on other grounds by *Abatie*, 458 F.3d at 969. The Supreme Court has

17  explained that "[a]pplying a deferential standard of review does not mean that the plan administrator

18  will prevail on the merits [but rather] . . . means only that the plan administrator's interpretation of

19  the plan "will not be disturbed if reasonable." *Conkright v. Frommert*, – U.S. – , 130 S.Ct. 1640,

20  1651 (2010) (citation omitted). "An ERISA administrator abuses its discretion only if it (1) renders

21  a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the

22  plain language of the plan or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete*

23  *Rozelle N.F.L. Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir.2005). A court may find clear error "when

24  the reviewing court is left with the definite and firm conviction that a mistake has been committed.'"

25  *Linich v. Broadspire Services, Inc.*, 2009 WL 775471, at * 2 (D. Ariz. March 23, 2009) (quoting

26  *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602

27  (1993)). In *Salomaa v. Honda Long Term Disability Plan*, the Ninth Circuit held that in determining

28  whether this standard is met, the court should consider "whether application of a correct legal

standard was '1) illogical, 2) implausible, or 3) without support in inferences that may be drawn

United States District Court

For the Northern District of California

1    from the facts in the record.'" 642 F.3d 666, 676 (quoting *United States v. Hinkson*, 585 F.3d 1247,

2    1262 (9th Cir. 2009)).

3                **C.    Objections**

4    Defendant brings a Motion to Strike the Declaration of Marcus May in Support of Plaintiff's

5    Motion for Summary Judgment ("Motion to Strike"), objecting to the May Declaration on the

6    ground that the Court may consider only documents contained in the administrative record in

7    deciding whether the denial of benefits constituted an abuse of discretion. *See* Docket No. 42.

8    Plaintiff, in turn, objects to the Hagestad and Adkins declarations on the same grounds.

9    The Court GRANTS the Motion to Strike.  The May Declaration offers factual assertions

10   relating to the question of whether the Plan abused its discretion in denying benefits, an inquiry that

11   is limited to the administrative record. *See Kludka v. Qwest Disability Plan*, 2012 WL 1681983, at

12   *14 (D.Ariz. May 14, 2012) ("Ordinarily, '[j]udicial review of an ERISA plan administrator's

13   decision on the merits is limited to the administrative record'") (quoting *Montour v. Hartford Life &*

14   *Acc. Ins. Co.*, 588 F.3d 623, 632 (9th Cir. 2009)). Similarly, the Court sustains Plaintiff's objections

15   to the portion of the Hagestad Declaration that summarizes the administrative record, that is ¶¶ 16-

16   36 of that declaration.

17   Plaintiff's objection is OVERRULED as to the remaining portions of the Hagestad

18   Declaration and as to the Adkins Declaration, which address the question of whether there is a

19   potential conflict of interest that may have implications for the applicable standard of review.

20   Plaintiff has cited no authority suggesting that the Court may not consider evidence outside of the

21   administrative record on these matters.  To the contrary, courts have recognized that evidence

22   outside of the administrative record may be required to decide what level of scrutiny to apply to a

23   plan's denial of benefits under ERISA where, as here, there is an alleged conflict of interest. *See*

24   *Pacific Shores Hosp. v. United Behavioral Health*, 2012 WL 1123870, at *2 (C.D.Cal., April 2,

25   2012) ("in this Circuit discovery beyond the administrative record is contemplated in establishing

26   the nature, extent, and effect on the decision-making process of a conflict of interest) (citing *Abatie*

27   *v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir.2006)).

28

**United States District Court**
For the Northern District of California

**D.**     **Whether IDSC Abused its Discretion in Terminating Plaintiff's Benefits**

Having reviewed the entire administrative record in this case, the Court finds that the termination of Plaintiff's benefits was clearly erroneous because it was illogical and without support in inferences that may be drawn from facts in the record.  The Court reaches this conclusion because: 1) Plaintiff was initially found to be disabled on the basis of Dr. Schweitzer's reports documenting Plaintiff's symptoms associated with knee pain, and the updated medical records reflect that Plaintiff's symptoms remained unchanged; 2) the only physician who conducted a paper review as part of the appeals process, Dr. Andrews, did not meaningfully address Plaintiff's subjective complaints of pain and did not explain why he rejected the findings of the physicians who had examined Plaintiff that Plaintiff's pain was disabling; 3) in the face of what IDSC considered to insufficient clinical findings supporting the conclusions of Plaintiff's treating physicians, IDSC did not conduct its own examination, even though the Disability Plan allowed for such an exam.

**1.**     **It Was Illogical to Deny Continued STD Benefits Where the Medical Evidence Showed No Change in Plaintiff's Condition**

As discussed above, IDSC initially approved Plaintiff's STD benefits based on: 1) Schweitzer's diagnosis of arthritis in Plaintiff's left knee, accompanied by "severe" pain and "markedly decreased [range of motion]," *see* AR 00068-00070; and 2) an x-ray revealing "tricompartmental arthritis," AR 00069.

The updated medical records do not reflect any significant change in Plaintiff's symptoms as of October 4, 2010.  To the contrary,  Dr. Schweitzer and Leslie Reynolds reported that Plaintiff continued to experience knee pain and Reynolds stated Plaintiff could work only 4 hour shifts and might need a chair – an accommodation that was not available.  AR 00079, 00085.  In addition, a subsequent MRI supported the diagnosis of arthritis in Plaintiff's left knee (finding "[f]emoropatellar arthrosis with grade IV chondrosis of the lateral patellar facet and patellar appex and grade II chondrosis of the trochlear groove").  AR 000113.   The MRI also revealed  "[i]ncreased signal and thickening of the antererior cruciate ligament, compatible with mucinous degeneration or partial anterior cruciate ligament disruption" and "[m]ild thickening and increased signal in the posterior cruciate ligament, consistent with low-grade partial disruption." AR 000113.   Dr. Shah prescribed a hinged knee brace for Plaintiff's "ligamentous knee injury," AR 000128, and Dr. Solares found

United States District Court

For the Northern District of California

1   that Plaintiff could not stand for more than an hour and would need "seated assistance" if he were

2   required to stand for prolonged periods.  AS 000130.  In short, none of the updated medical records

3   offer any reasonable basis for concluding that Plaintiff's condition had improved as compared to the

4   initial period of STD benefits.

5          To the extent the updated medical records document essentially the same disabling

6   symptoms that the Plan previously found to be disabling, the Plan's termination of Plaintiff's

7   benefits was illogical and, in combination with the additional considerations discussed below,

8   supports a finding of clear error.  *See Caesar v. Hartford Life and Acc. Ins. Co.,* 2012 WL 1118613

9   (6th Cir. Jan. 13, 2012) (holding that plan administrator acted arbitrarily in cutting off benefits that it

10  had been paying previously where there was "no evidence that [the claimant's] condition had

11  improved since the time that it found her disabled").

12              **2.      The Denial was Arbitrary Because Dr. Andrews did not Explain Why he**
                          **Rejected the Findings of the Physicians who had Examined Plaintiff**

13

14         The plan administrator based its denial of Plaintiff's appeal on a paper review of the record

15  by Dr. William Andrews.  The review is cursory, at best.  While acknowledging Plaintiff's

16  "subjective complaints of left knee pain," and that the MRI revealed arthritis in Plaintiff's left knee,

17  Dr. Andrews did not explain why he disagreed with the conclusions of all of the physicians and care

18  providers who examined Plaintiff that Plaintiff was unable to stand for prolonged periods, as his

19  customary position required.  Indeed, Dr. Andrews did not even acknowledge that Plaintiff's

20  examining physicians consistently found that he was unable to stand for prolonged periods.   Nor did

21  Dr. Andrews speak to Plaintiffs' health care providers.  Rather, he left messages stating that if they

22  did not return his call within 24 hours their opinions would be disregarded.[12]

23         Plan administrators are not required to "automatically . . . accord special weight to a

24  claimant's physicians."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  On the

25

26         [12]The Court notes that Dr. Hinkamp's 10/22/10 telephone call to Dr. Schweitzer's office was
    returned by Leslie Reynolds promptly.  *See* AR 000021, 000025.   Had Dr. Andrews allowed a
27  reasonable period of time for a response to his telephone messages, it is likely he would have been able
    to talk with either Ms. Reynolds or Dr. Schweitzer, both of whom had examined Plaintiff and were
    familiar with his medical condition.  *See Cooper v. Life Ins. Co. of North America*, 486 F.3d 157, 168
28  (6th Cir. 2007) (finding that independent physician reviewer's "haste to complete his report in disregard
    of his explicit instructions to interview [the claimant's] treating physicians was unreasonable, especially
    because he allowed so little time before he 'pulled the trigger'").

United States District Court
For the Northern District of California

1   other hand, "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable

2   evidence, including the opinions of a treating physician." *Id*.  To the extent that Dr. Andrews did not

3   offer any meaningful explanation for his rejection of the opinion's of Plaintiff's physicians, the

4   Disability Plan's reliance on Dr. Andrews' conclusion was arbitrary.

> **3.       The Denial Was Arbitrary Because in the Face of What it Contended Was Insufficient Medical Documentation the Plan Administrator Did not Conduct its Own Examination**

7          The administrator's denial of continued STD benefits was also arbitrary to the extent that it

8   was based on Dr. Andrews' implicit rejection of Plaintiff's subjective complaints of pain.  Dr.

9   Andrews did not offer any specific reason for rejecting Plaintiff's subjective pain, although he

10  apparently relied on the absence of "comprehensive exam findings."  *See* AR 000138-000139.   It is

11  unclear what sorts of findings Dr. Andrew felt were lacking.  Plaintiff had been diagnosed with

12  arthritis in his left knee, and that diagnosis was supported by both an x-ray and an MRI.  His doctors

13  had consistently noted that Plaintiff experienced severe pain and had prescribed pain medications

14  accordingly.  They had also found that Plaintiff's range of motion was "markedly decreased."

15  Following the MRI, Plaintiff's doctors had also diagnosed a "ligamentous injury" and prescribed a

16  knee brace.   Whatever additional findings might have been required to determine whether Plaintiff's

17  pain was severe enough to result in disability could have been obtained by ordering an independent

18  examination be conducted to evaluate Plaintiff's condition.  It is undisputed that the Disability Plan

19  had the right to order such an examination, yet it failed to do so.

20         While a plan is not required to accept a claimants subjective complaints as to the degree of

21  severity, it may be arbitrary and capricious to reject such complaints without a principled reason.

22  *DuPerry v. Life Ins. Co. of North America*, 632 F.3d 860, 874-875 (4th Cir. 2011) (holding that

23  while disability plan was not required to simply accept subjective pain complaints, it could not

24  simply dismiss those complaints "out of hand, especially where there is objective medical proof of a

25  disease that could cause such pain").  Further, in determining whether the denial was arbitrary, the

26  court may consider the fact that the plan had the right to arrange for an independent medical

27  evaluation but failed to do so.  *See Smith v. Continental Cas. Co.*, 450 F.3d 253, 263-264 (6th Cir.

28  2006) (holding that plan acted arbitrarily where it denied disability claim based on rejection of

subjective pain evidence but failed to order independent medical examination, even though it had the

United States District Court

For the Northern District of California

right to conduct such an examination).

Based on all of the considerations discussed above, the Court concludes that the Plan abused its discretion when it terminated Plaintiff's STD benefits.  Therefore, the Court remands for an award of benefits retroactive to the effective date of denial for the full 22 week period for which STD benefits would have been available.  *See Pannebecker v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1213, 1221 (9th Cir. 2008) (explaining that "[w]here an administrator's initial denial of benefits is premised on a failure to apply plan provisions properly, we remand to the administrator to apply the terms correctly in the first instance . . . [b]ut if an administrator *terminates* continuing benefits as a result of arbitrary and capricious conduct, the claimant should continue receiving benefits until the administrator properly applies the plan's provisions").

### E.    Whether Attorneys' Fees and Costs Should be Awarded

Plaintiff requests an award of fees pursuant to 29 U.S.C. § 1132(g).  The Court concludes that an award of attorneys' fees and costs is appropriate.

Under 29 U.S.C. § 1132(g), a court in its discretion may award reasonable attorneys' fees and costs of an action by a plan participant to either party.  The Ninth Circuit has held that in exercising this discretion, district courts should consider the following factors:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

*Hummell v. S.E. Rykoff & Co.*, 634 F.2d 446, 453 (9th Cir.1980).  Courts generally construe the *Hummell* factors in favor of participants in employee benefit plans.  *McElwaine v. U.S. West, Inc.*, 176 F.3d 1167, 1172 (9th Cir. 1999) ("When we apply the *Hummell* factors, we must keep at the forefront ERISA's purposes that 'should be liberally construed in favor of protecting participants in employee benefit plans").

In light of the Court's conclusion that the denial of Plaintiff's request for continued STD benefits was arbitrary and capricious, the first, third and fifth *Hummell* factors favor an award of fees.  The second factor also favors an award as Defendant has presented no evidence in response to Plaintiff's fee request suggesting that it would be unable to satisfy an award of fees.  Only one of the

*Hummell* factors – the fourth factor – arguably does not support an award of fees.  Therefore, considering all of the *Hummell* factors, the Court finds that Plaintiff's request for fees and costs under § 1132(g) should be granted.

**V.      CONCLUSION**

Plaintiff's Motion is GRANTED.  Defendant's Motion is DENIED.  The parties shall meet and confer to address the amount of STD benefits to which Plaintiff is entitled under this Order, as well as the amount of Plaintiff's reasonable attorneys' fees and costs.  If the parties are unable to reach agreement on these issues, within 21 days of the date of this order Plaintiff shall bring a motion setting forth any issues that remain to be resolved by the Court.  Defendant may file a response within fourteen (14) days thereafter.

IT IS SO ORDERED.

Date:   June 4, 2012

_____
JOSEPH C. SPERO
United States Magistrate Judge

**United States District Court**
For the Northern District of California

25